UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

CREATIVE ARTS BY CALLOWAY, LLC,

                                        Plaintiff,

                    - against -                                   **OPINION AND ORDER**

                                                                  09-CV-10488 (CS)

CHRISTOPHER BROOKS, D/B/A THE CAB
CALLOWAY ORCHESTRA,

                                        Defendant.
------------------------------------------------------------------------x

Appearances:
Marc A. Karlin
Karlin & Karlin, APLC
Los Angeles, California

Ivan A. Saperstein
Saperstein & Crowell, LLP
New Rochelle, New York
*Counsel for Plaintiff*

Christopher W. Brooks
Fleetwood, New York
Pro Se *Defendant*

Seibel, J.

Before this Court is the Motion for Summary Judgment of Defendant Christopher Brooks

pursuant to Federal Rule of Civil Procedure 56. (Doc. 54.) For the following reasons,

Defendant's Motion is GRANTED.

## I.   Background

### A.   Factual Background

The following facts are undisputed except where noted.

Plaintiff Creative Arts by Calloway, LLC is a Delaware limited liability company founded in December 2000 by the late jazz musician Cab Calloway's widow, Zulme Calloway; his daughters, Chris Calloway and Cabella Calloway Langsam; and his son-in-law, Andrew Langsam, M.D.  (P's 56.1 ¶ 5; D's 56.1 ¶ 5.)[1]  Defendant Christopher W. Brooks is Cab Calloway's eldest grandson and a professional musician who performed nationally with Cab Calloway from 1978 until 1993.  (P's 56.1 ¶¶ 1-2.)

In 1998, Defendant founded a tribute act, The Cab Calloway Orchestra, a name he has used continuously from its date of adoption in connection with the Orchestra's live musical performances as well as the sale of its compact discs and videotapes.  (*Id.* ¶¶ 3-4.)

Prior to Plaintiff's formation, Mrs. Calloway filed Application No. 75/761,159 with the U.S. Patent and Trademark Office ("USPTO") on July 23, 1999 as an intent-to-use ("ITU") applicant under 15 U.S.C. § 1051(b) for the mark "CAB CALLOWAY."  (*Id.* ¶ 6.)  Mrs. Calloway executed an assignment transferring her ITU application to Plaintiff on January 22, 2001 without submitting an amendment to allege use, *see* 15 U.S.C. § 1051(c), or a verified statement of use accepted by the USPTO, *see* 15 U.S.C. § 1051(d).  (*Id.* ¶¶ 8-9; Langsam Decl. Ex. 5.)[2]

---

[1] "P's 56.1" refers to Plaintiff Creative Arts by Calloway, LLC's Counterstatement of Material Facts Pursuant to Local Rule 56.1.  (Doc. 69.)  "D's 56.1" refers to Defendant's Civil Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue To Be Tried.  (Doc. 55.)

[2] "Langsam Decl." refers to Declaration of Cabella Calloway Langsam in Opposition to the Motion for Summary Judgment of Defendant Christopher Brooks.  (Doc 65.)

On February 24, 2009, Defendant opposed Plaintiff's ITU application for the mark "CAB

CALLOWAY" on the grounds that its similarity to his previously-used mark, "THE CAB

CALLOWAY ORCHESTRA," would cause public confusion in violation of Section 2(d) of the

Lanham Act, 15 U.S.C. § 1052(d). (P's 56.1 ¶ 74.) The Trademark Trial and Appeal Board

("TTAB") upheld Defendant's opposition to Plaintiff's ITU application based on Defendant's

prior use of "THE CAB CALLOWAY ORCHESTRA" mark for live musical performances and

sales of CDs and videotapes. (*Id.* ¶¶ 77, 79.) The TTAB further found that the similarities

between Defendant's mark and Plaintiff's proposed mark would result in a likelihood of

confusion under Section 2(d). (*Id.* ¶ 79.)

   B.   Procedural Background

   Although the parties have been engaged in litigation relating to the use of Cab

Calloway's name and music for the last decade, *see Creative Arts by Calloway, LLC v. Brooks*,

("*Calloway III*"), No. 05-CV-8638, 2007 WL 766079 (S.D.N.Y. Mar. 12, 2007); *Creative Arts*

*by Calloway, LLC v. Brooks* ("*Calloway I*"), No. 01-CV-3192 (S.D.N.Y. Dec. 11, 2001), *aff'd*

*Creative Arts by Calloway, LLC v. Brooks* ("*Calloway II*"), 48 F. App'x 16 (2d Cir. 2002)

(summary order), the instant claims stem from the TTAB's decision upholding Defendant's

opposition to Plaintiff's ITU application, *see Brooks v. Creative Arts by Calloway, LLC*, 93

U.S.P.Q.2d 1823 (T.T.A.B. 2009) (precedential) ("TTAB Decision"). (Doc. 1.)

   On December 28, 2009, Plaintiff filed an action in this Court challenging the TTAB

Decision pursuant to Section 21(b) of the Lanham Act, 15 U.S.C. § 1071(b), arguing that the

TTAB erred in holding that Defendant's prior use barred Plaintiff's registration of the mark.

During this Court's review of the TTAB Decision, Defendant raised additional allegations about

the validity of Mrs. Calloway's assignment of the ITU application to Plaintiff. (*See* D's Pre-

3

Trial Mem. 12-13; Oct. Tr. 2-5.)[3]  On December 9, 2011, I allowed limited discovery[4] on the

issue of whether "between July 23, 1999 and January 22, 2001, Zulme Calloway's 'business

activities' were organized as an ongoing and existing business to which the 'Cab Calloway' mark

pertained, within the meaning of 15 U.S.C. § 1060." (Dec. Order 2.)[5]

On March 13, 2012, Defendant moved for summary judgment pursuant to Federal Rule

of Civil Procedure 56, alleging that the assignment of the ITU application from Mrs. Calloway to

Plaintiff was invalid under 15 U.S.C. § 1060 because Mrs. Calloway did not operate an ongoing

business to which the mark "CAB CALLOWAY" pertained between the filing of her ITU

application on July 23, 1999 and her assignment of the ITU application on January 22, 2001,

thus rendering the assignment invalid. (*See* D's Mem. 1-3.)

Although Plaintiff provides few specific dates allowing the Court to discern which of the

alleged activities occurred after July 23, 1999, Plaintiff alleges that the following activities in

which Mrs. Calloway engaged relating to the mark "CAB CALLOWAY" constituted an

"ongoing and existing" business:  (1) authorizing the Cab Calloway School of the Arts to sell

clothing and other items bearing the mark Cab Calloway pursuant to a license from Cab

---

[3] "D's Pre-Trial Mem." refers to Defendant[']s Memorandum of Pre-Trial Admission and Discovery.
(Doc. 37.)  "Oct. Tr." refers to the transcript of the October 14, 2011 status conference. (Doc. 45.)

[4] Plaintiff alleges that Defendant has conducted no such discovery.  (Plaintiff Creative Arts by Calloway,
LLC's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary
Judgment ("P's Mem."), (Doc. 67), 1.)

[5] "Dec. Order" refers to the December 9, 2011 Order. (Doc. 50.)  In the underlying TTAB action, the
parties executed a stipulation barring the admission of evidence of use prior to July 23, 1999, the date of
Plaintiff's ITU application.  (Defendant[']s Memorandum Supporting Summary Judgment as to Invalid
Assignment of Unregistered Trademark ("D's Mem."), (Doc. 59), Ex. A ¶ 9.)  Although Plaintiff asserts
that the stipulation pertained only to litigation before the TTAB and is not relevant to the instant Motion,
(*see* P's 56.1 ¶ 7), I ruled on October 14, 2011 that the stipulation remains binding here, and July 23, 1999
remains the earliest date upon which the Plaintiff may rely "for the services set forth in the [a]p[p]lication,
and for purposes of the opposition." (Oct. Tr. 13.)  January 22, 2001 is the date Mrs. Calloway
transferred the ITU application to Plaintiff. (P's 56.1 ¶ 8.)

Calloway, (*see* P's 56.1 Reply ¶ 7);[6] (2) founding the Cab Calloway Foundation to promote the

arts and education, (*see id.* ¶ 10); (3) commencing negotiations for a Broadway musical based on

Cab Calloway's music and life story, (*see id.* ¶¶ 12, 24); (4) licensing and receiving royalties

from Cab Calloway's musical compositions, (*see id.* ¶¶ 20-21, 25, 32, 34); and (5) retaining the

services of professional accountants and attorneys to aid with management and enforcement of

her Cab Calloway-related rights, (*see id.* ¶¶ 14, 16, 22-24).  Defendant does not dispute that any

of the aforementioned activities enumerated by Plaintiff actually occurred; rather, Defendant

argues that none rise to the level of operating an "ongoing and existing" business to which the

mark "CAB CALLOWAY" pertained, thus invaliding the assignment of the mark to Plaintiff.[7]

## II.   Legal Standard

### A.   Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

---

[6] "P's 56.1 Reply" refers to "Plaintiff's Statement of Additional Material Facts in Dispute" that is appended to Plaintiff Creative Arts by Calloway, LLC's Counterstatement of Material Facts Pursuant to Local Rule 56.1.  (Doc. 69.)

[7] Defendant does, however, object that most of the activities that Plaintiff alleges constitute an "ongoing and existing" business of Mrs. Calloway are barred by stipulation and that all are irrelevant to the instant issue.  (*See* Defendant Christopher Brooks DBA The Cab Calloway Orchestra Counterstatement Regarding "Plaintiff Statement of Additional Material Facts in Dispute" Pursuant to Local Rule 56.1, ("D's 56.1 Obj."), (Doc. 76), 10-11, 12-13, 14-15, 17, 19-20, 22-29, 37-38, 40-41.)  Likewise, Defendant objects that similar allegations by the Plaintiff have been previously litigated in one or more of the prior suits between the parties.  (*See id.*)  The Court will address Defendant's specific objections below.

believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  The movant

bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if

satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every

element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex

Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "The mere existence of a scintilla of evidence in

support of the [non-movant's] position will be insufficient; there must be evidence on which the

jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  Moreover, the

non-movant "must do more than simply show that there is some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),

and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v.

Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other

materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the

motion, it "must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R.

Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d

Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of

fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed

for purposes of the motion" or "grant summary judgment if the motion and supporting materials

-- including the facts considered undisputed -- show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Because Defendant is appearing *pro se*, he is entitled to "special solicitude" in that his "submissions must be construed liberally . . . to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (internal quotation marks and citations omitted).[8]

B.    TTAB Appeal

Section 21(b) of the Lanham Act, 15 U.S.C. § 1071(b), permits any party dissatisfied with a TTAB ruling to commence an action in a United States District Court.  15 U.S.C. § 1071(b)(1); *see Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 852 (2d Cir. 1988) ("The section 1071(b) action in a district court is not, strictly speaking, an 'appeal' at all, but an independent judicial proceeding provided as an alternative to a direct appeal to the Federal Circuit . . . .").  Upon the motion of either party, the court must admit the entire record presented to the TTAB, and either party may supplement the record with additional evidence.  15 U.S.C. § 1071(b)(3).[9]

"A district court sits in a dual capacity in reviewing a TTAB decision . . . ." *Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, No. 07-CV-5804, 2009 WL 959775, at *2 (S.D.N.Y. Apr. 8, 2009).  While the TTAB's legal conclusions are reviewed *de novo*, the district court applies a "substantial evidence" standard to review the facts found before

---

[8] Defendant's papers reveal familiarity with the legal process, but that familiarity apparently comes not from his training or education, but from having been sued by Plaintiff so many times.  Thus, while Defendant's submissions are a cut above the level of some other *pro se* submissions, he is still entitled to special solicitude.

[9] Defendant moved pursuant to 15 U.S.C. § 1071(b)(3) for admission of the administrative record before the TTAB, (*see* Opinion and Order, (Doc. 25), 11), and I granted the motion, (*see id.*; Oct. Tr. 8).  The testimony and exhibits from the TTAB record thus "have the same effect as if originally taken and produced in the suit."  15 U.S.C. § 1071(b)(3).

the TTAB and serves as the fact-finder for any new evidence presented. *Id.* The District Court

may also adjudicate determinative antecedent issues, including the validity of the assignment of a

trademark. *See Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 623 F.3d 61, 68, 70-

71 (2d Cir. 2010) (for claims brought under Lanham Act, jurisdiction of federal courts extends to

"the antecedent issue of the validity of the assignment" as "only after a *valid* assignment of

trademarks does the assignee succeed to the rights of the assignor") (emphasis in original);

*accord Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 13 (D.C. Cir. 2008)

(district court may "consider . . . new issues . . . that were not before the TTAB"); *CAE, Inc. v.*

*Clean Air Eng'g, Inc.*, 267 F.3d 660, 674 (7th Cir. 2001) (district court's review of TTAB's

decision is *de novo* when parties assert new claims).

## III.   Discussion

The law is clear that trademark rights exist only in connection with an existing business.

*See United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918) ("There is no such thing

as property in a trade-mark except as a right appurtenant to an established business or trade in

connection with which the mark is employed."); *see also Defiance Button Mach. Co. v. C & C*

*Metal Prods. Corp.*, 759 F.2d 1053, 1059 (2d Cir. 1985) ("A trademark or trade name

symbolizes the goodwill attaching to a business.").

"[T]he transfer of a trademark or trade name without the attendant goodwill of the

business which it represents is, in general, an invalid, 'in gross' transfer of rights." *Berni v. Int'l*

*Gourmet Rests. of Am., Inc.*, 838 F.2d 642, 646 (2d Cir. 1988). The Lanham Act seeks to

prevent trafficking in trademarks because the "[u]se of the mark by the assignee in connection

with a different goodwill and different product would result in a fraud on the purchasing public

who reasonably assume that the mark signifies the same thing, whether used by one person or another." *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984).

The Lanham Act prohibits assignment of an ITU application absent an amendment to allege use or a verified statement of use,[10] "except for an assignment to a successor to the business of the applicant, or portion thereof, to which the mark pertains, if that business is ongoing and existing." 15 U.S.C. § 1060(a)(1). In other words, an ITU applicant may only transfer its application to another if it is transferred with at least the part of the applicant's "ongoing and existing" business to which the mark pertains. When an ITU application is assigned in violation of Section 1060(a)(1) – for example, to an entity other than the successor of the applicant's "ongoing and existing" business – the assignment and, in turn, the ITU application for the registration of the mark, are invalid. *Fitzpatrick v. Sony-BMG Music Entm't, Inc.*, No. 07-CV-2933, 2010 WL 3377500, at *2 (S.D.N.Y. Aug. 24, 2010) (assignment of trademark "in gross" – that is, without accompanying goodwill – renders assignment invalid); *Clorox Co. v. Chem. Bank*, 40 U.S.P.Q.2d 1098, 1100, 1104 (T.T.A.B. 1996) (precedential) (prohibited assignment also voids ITU application and resulting registration).

Before discussing whether the ITU application was assigned to a successor of Mrs. Calloway's "ongoing and existing" business, I must preliminarily address Plaintiff's arguments regarding the applicability of the Lanham Act's anti-trafficking provision.[11] First, Plaintiff alleges that "because an ITU applicant generally does not yet possess goodwill represented by the mark" and "the exception to the anti-assignment provisions of 15 U.S.C. § 1060 does not

---

[10] It is undisputed that Plaintiff submitted neither an amendment to allege use pursuant to 15 U.S.C. § 1051(c) nor an accepted verified statement of use pursuant to 15 U.S.C. § 1051(d). (P's 56.1 ¶¶ 8-9.)

[11] Plaintiff's Memorandum of Law in opposition to Defendant's Motion cites only one treatise and four cases, two of which establish the summary judgment standard and one of which is a non-precedential decision of the TTAB. Plaintiff's efforts barely comply with Local Civil Rule 7.1(a)(2), requiring a memorandum of law to "[set] forth the cases and other authorities relied upon in support of the motion."

contain a goodwill requirement," the Court erred in its December 9, 2011 Order when it held that "at the time of the January 2001 assignment from Mrs. Calloway to Plaintiff of the ITU application, Mrs. Calloway's business activities had to be organized in such a way that there was goodwill attached to the mark CAB CALLOWAY."[12] (P's Mem. 13-14 (citing 3 *J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition* § 18:13 (4th ed. 2012).) Accordingly, Plaintiff asserts that finding that Mrs. Calloway's pre-January 22, 2001 activities generated "goodwill" is not a prerequisite for a valid transfer of the ITU application. (*See* P's Mem. 13-15.)

In so arguing, Plaintiff seems to conceptualize goodwill as a concept independent of both a trademark and an "ongoing and existing" business, (*see id.*), rather than synonymous with the part of an "ongoing and existing" business that a trademark symbolizes. *See Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank*, 696 F.2d 1371, 1375 (Fed. Cir. 1982) ("Since goodwill is inseparable from the business with which it is associated, when one speaks of the transfer of goodwill that accompanies a mark, one necessarily means the transfer of the portion of the business or service with which the mark is associated.") (citation and internal quotation marks omitted).

It is well settled that "[t]rademark rights do not exist in the abstract, to be bought and sold as a distinct asset." *Universal City Studios, Inc. v. Nintendo Co.*, 578 F. Supp. 911, 922 (S.D.N.Y. 1983). Rather, a trademark only exists in connection with an existing business, *see United Drug*, 248 U.S. at 97, and "[a] trade name or mark is merely a symbol of goodwill . . . [with] no independent significance apart from the goodwill it symbolizes," *Marshak*, 746 F.2d at

---

[12] The portion of the December 9, 2011 Order to which Plaintiff refers stated: "The question here is whether, at the time of Zulme Calloway's assignment of the ITU application to Plaintiff, she operated a going concern with goodwill, organized as a business, to which the mark 'Cab Calloway' pertained." (Dec. Order 2.)

929 ("There are no rights in a trademark apart from the business with which the mark has been associated; they are inseparable."). Because the goodwill symbolized by a trademark does not exist in the absence of an "ongoing and existing" business, an ITU applicant who "merely has an intention to use a mark in a business not yet established" cannot validly assign a trademark. 3 *J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition* § 18:13 (4th ed. 2012) (without an established business, "[t]here is as yet no good will represented by the mark"); *accord Clorox*, 40 U.S.P.Q.2d at 1105 ("[A]n 'intent to use' application may be assigned only to a successor to the business of the applicant or to that portion of the business to which the mark relates. The business of the applicant must be 'ongoing and existing.' This requirement fills a loophole that would permit otherwise prohibited assignments. For example, an 'intent to use' applicant may intend to create a new business in which the mark will be used but decide, after the application is made, not to do so. Without the requirement that the business be 'ongoing and existing,' the applicant would be able to assign the marks that are the subject of the 'intent to use' application to another business . . . .").

As goodwill is inseparable from an "ongoing and existing" business utilizing the trademark in question, the critical inquiry regarding the validity of Mrs. Calloway's assignment of the ITU application to Plaintiff is – as I stated in my December 9, 2011 Order – whether "Zulme Calloway's 'business activities' [between July 23, 1999 and January 22, 2001] were organized as an ongoing and existing business to which the 'Cab Calloway' mark pertained." (Dec. Order 2.)

Plaintiff further alleges that the trademark trafficking concerns addressed by Section 1060(a)(1) are inapposite here because Mrs. Calloway and Plaintiff had a *bona fide* intent to use the mark "CAB CALLOWAY" in commerce. (*See* P's Mem. 14.) That Plaintiff or Mrs.

Calloway may have intended to use the mark does not enable Plaintiff to avoid the application of

the Lanham Act's anti-trafficking provision.  Indeed, that provision's purpose is to provide

assurance that an ITU applicant's intention to use the mark is *bona fide* by prohibiting

assignments unless the application is assigned with the business to which the mark pertains,

preventing "trafficking or profiting from the sale of an ITU application." *Clorox*, 40 U.S.P.Q.2d

at 1100; *accord Pfizer, Inc. v. Gregg Hamerschlag*, Opp. No. 118,181, 2001 WL 1182865, at *4

(T.T.A.B. Sept. 27, 2001) (non-precedential) ("Unwittingly or not, a party who has no business

except obtaining a trademark on the basis of intent to use and who prior to starting a business

assigns that application to another falls squarely into the trademark trafficking activity that

Section 10 is intended to preclude.").  Mrs. Calloway's or Plaintiff's intent might be

independently determined to be *bona fide*, and the transfer between the two might not seem to

amount to what we commonly think of as "trafficking."  But Congress saw fit to protect against

trafficking by a bright-line rule not admitting of exceptions, and that rule allows a transferor to

establish her *bona fides* only one way:  by transferring the ITU application along with an

ongoing business.

Thus, the relevant inquiry remains whether Mrs. Calloway operated an "ongoing and

existing" business to which the mark pertained.

A.     Assignment of the ITU Application to Plaintiff

Unlike *Clorox*, where the TTAB found a violation of the anti-trafficking provision of the

Lanham Act from the language of the assignment of the ITU application itself – it was assigned

to a bank as collateral in a security agreement and the bank was plainly not a successor to the

business to which the mark pertained, *see* 40 U.S.P.Q.2d at 1100-01 – Plaintiff argues that the

assignment here is valid because the document properly transferred both the ITU application and

12

Mrs. Calloway's "ongoing and existing" business to the Plaintiff, (*see* P's Mem. 12). The sufficiency of the assignment's language, however, does not alone meet the requirement of Section 1060(a)(1). The language of the assignment does not control whether Mrs. Calloway's activities were actually organized as an "ongoing or existing business," thus rendering the assignment of the application valid. *Compare Greene v. Ab Coaster Holdings, Inc.*, Nos. 10-CV-38, 10-CV-234, 2012 WL 4442749, at *8-10 (S.D. Ohio Sept. 25, 2012) (invalidating assignment of ITU application in document that purported to also transfer ongoing and existing business pertaining to mark at issue), *with Fitzpatrick*, 2010 WL 3377500, at *3 (upholding assignment of ITU application in document that purported to also transfer ongoing and existing business pertaining to mark at issue).

Indeed, Defendant voices no opposition to Plaintiff's contention regarding the adequacy of the assignment document itself in transferring the Cab Calloway-related rights held by Mrs. Calloway to Plaintiff. Rather, Defendant asserts that the assignment of the ITU application to Plaintiff is void because, as a factual matter, Mrs. Calloway's actions with respect to those rights before the assignment (between July 23, 1999 and January 22, 2001) were not organized as an "ongoing and existing" business as required by the statute. (*See* D's Mem. 12-18.)

B.    Assignor's Business Activities Post-July 23, 1999

Defendant alleges that Mrs. Calloway never used the mark "CAB CALLOWAY" in any ongoing and existing business during the relevant time period, (*see* D's Mem. 12-18; D's Reply 1-3),[13] while Plaintiff alleges that Mrs. Calloway transferred her ongoing business activities related to the mark – involvement with the Cab Calloway School of the Arts and the Cab Calloway Foundation; development of a musical based on Cab Calloway's life and music; and

---

[13] "D's Reply" refers to Defendant Christopher Brooks['] Reply Memorandum Supporting Summary Judgment as to Invalid Assignment." (Doc. 74.)

13

management of licensing and royalties for Cab Calloway's likeness and compositions – to

Plaintiff on or about the time she assigned the ITU application in January 2001, (*see* P's Mem. 2,

4-10, 12).

　　To show that Mrs. Calloway in January 2001 had no "ongoing or existing" business to

which the mark "CAB CALLOWAY" pertained, Defendant cites extensively to a May 2001

deposition of Cabella Calloway Langsam taken in connection with *Calloway I* – an earlier suit

between the same parties that resulted in a holding that Plaintiff failed to establish that it or Mrs.

Calloway owned or used the common law service mark "CAB CALLOWAY" because Cab

Calloway was not operating a business at his death that passed to his widow under the will.

*Calloway I*, slip op. 9-10.  Plaintiff objects to Defendant's reliance on the *Calloway I* record in

the instant action.[14]  (P's 56.1 ¶¶ 26-49.)  The May 2001 deposition of Mrs. Langsam, a founding

member of Plaintiff, is an admission by an opposing party that will be considered on summary

---

[14] Plaintiff objects not only to Defendant's citations to Mrs. Langsam's 2001 deposition testimony taken
in the *Calloway I* suit but also to his citations to the *Calloway I* record, (P's 56.1 ¶¶ 46-49), and the text of
the *Calloway I* and *Calloway II* decisions, (P's 56.1 ¶¶ 61-66, 69, 71-72).  Plaintiff is correct that these
earlier actions were limited to the question of whether Plaintiff had service mark rights in the mark "CAB
CALLOWAY" relating to entertainment services, and although the holdings of the previous actions (to
the effect that Cab Calloway did not transfer an ongoing business to Mrs. Calloway in his will, and thus
also did not transfer a service mark in his name) remain binding, the question of whether Mrs. Calloway
had an "ongoing and existing" business between July 23, 1999 and January 22, 2001 relating to the mark
"CAB CALLOWAY" was not at issue there.  Defendant's citations to the *Calloway I* or *Calloway II*
record – aside from Mrs. Langsam's 2001 deposition, as discussed in the text, – will thus be disregarded.
(D's 56.1 ¶¶ 46-49, 61-66, 69, 71-72; D's Obj, Exs.  6, 8, 9, 11, 12, 14, 15.)  Defendant also cites an
objection from Plaintiff's counsel during a December 2008 deposition in another matter, and Plaintiff
appears to object to Defendant's citation by stating, "Plaintiff's counsel properly placed an objection on
the record to the form of the question."  (P's 56.1 ¶ 50; D's 56.1 ¶ 50.)  Although Plaintiff's counsel's
statement is arguably an agency admission, *see* Fed. R. Evid. 801(d)(2)(D), an attorney's objections
ordinarily cannot be considered evidence on a motion for summary judgment, *State of N.Y. v. Almy Bros.,
Inc.*, 866 F. Supp. 668, 678 (N.D.N.Y. 1994), and thus I will disregard the statement of Plaintiff's
counsel.  Finally, Defendant submits his own declaration in connection with his motion papers,
(Declaration of Defendant Christopher Brooks in Support of Motion for Summary Judgment, (Doc. 57)),
and Plaintiff objects to many of Defendant's statements, (Plaintiff Creative Arts by Calloway, LLC's
Evidentiary Objections to the Declaration of Defendant Christopher Brooks, (Doc. 64)).  Rather than
address each of Plaintiff's individual evidentiary objections, I disregard the disputed portions of
Defendant's declaration.

judgment. *See* Fed. R. Evid. 801(d)(2). Moreover, Plaintiff may not submit a declaration in connection with a summary judgment motion that conflicts with earlier deposition testimony, and, thus, any portion of Mrs. Langsam's declaration conflicting with her earlier deposition testimony will be disregarded. *See Ramos v. Baldor Specialty Foods, Inc.*, No. 10-CV-6271, 2011 WL 2565330, at *4 (S.D.N.Y. June 16, 2011) (contradictory declaration not subject to cross-examination and runs afoul of rule that a party may not create a material issue of fact on summary judgment by submitting contradictory declarations); *see also Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 (2d Cir. 1999) ("It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony.") (alteration and internal quotation marks omitted).

Mrs. Langsam stated in her deposition that Mrs. Calloway used the mark "CAB CALLOWAY" before January 22, 2001 to receive royalties from Cab Calloway's sound recordings and to approve the usage of his image or name, but she took no steps to "market, merchandise, advertise, promote, and sell the products bearing Cab Calloway's name, likeness, voice, or caricature," even after September 2000 following a settlement with third parties pursuant to which she was assigned additional rights relating to Cab Calloway.[15] (D's Reply Ex. 1 ("Langsam Dep."), 52:7-13, 84:2-13, 99:25-100:18.)[16]

---

[15] Mrs. Calloway filed two lawsuits in California against Richard Albert, Ron Rainey, and their respective corporate entities related to rights Cab Calloway had assigned to them prior to his death; these suits settled in the summer of 2000 when the Messrs. Albert and Rainey and the relevant corporate entities assigned to Mrs. Calloway all of the rights that they had obtained from Cab Calloway. (P's Mem. 6-8.)

[16] Plaintiff objects to Mrs. Langsam's statement that her mother did not promote Cab Calloway-related products as "incorrect," but provides no details regarding its objection other than, "See Cabella's dc., Gear." (P's 56.1 ¶ 32.) Plaintiff appears to be asserting that the license to Gear, Inc. to manufacture and sell t-shirts bearing the mark "CAB CALLOWAY" (which Mrs. Calloway was assigned in summer 2000 following the settlement agreement) contradicts Mrs. Langsam's deposition testimony that Mrs. Calloway took no steps to "market, merchandise, advertise, promote and sell the products bearing Cab Calloway's name, likeness, voice, or caricature." (Langsam Dep. 52:7-13.) Plaintiff alleges only that Gear, Inc. received the license to manufacture and sell t-shirts with the mark "CAB CALLOWAY" from one of

Mrs. Calloway took no other actions to create an association between herself and the

mark "CAB CALLOWAY" "[o]ther than being his widow." (*Id.* at 92:2-7.)  Specifically, Mrs.

Langsam stated that prior to May 2001 Mrs. Calloway never used the "CAB CALLOWAY"

mark for any of the services enumerated in her ITU application: websites or retail

establishments selling Cab Calloway-related media;[17] internet multimedia programming;

distribution of musicals, comedies, or dramas; or radio programming, production, and

distribution of music.[18]  (*See id.* at 112:5-14, 112:24-113:18; *see also* D's Mem. Ex. G.)  Mrs.

Langsam also agreed that the mark "CAB CALLOWAY" only described her father's name and

did not have any other significance or connotations to the public.  (Langsam Dep. 83:8-19.)

---

Messrs. Albert and Rainey's corporate entities in 1996, and the license, and corresponding royalties, were assigned to Mrs. Calloway following the settlement.  (Langsam Decl. ¶ 34.)  As Plaintiff does not allege that Mrs. Calloway made any efforts in marketing, merchandising, advertising, promoting, or selling the Cab Calloway t-shirts pursuant to the Gear, Inc. license after it was assigned to her, or identify any document suggesting otherwise, Plaintiff's objection to Mrs. Langsam's testimony is not well taken.

[17] Plaintiff objects to Defendant's 56.1 statement that Mrs. Langsam's deposition testimony admitted that neither Mrs. Calloway nor Plaintiff ever conducted any ongoing retail or internet sales for Cab Calloway-related compact discs or other items prior to May 2001 as a "misstate[ment]" of Mrs. Langsam's testimony.  (P's 56.1 ¶¶ 35-36.)  Plaintiff's objection is unfounded as both parties assert that the testimony establishes that neither Mrs. Calloway nor Plaintiff ever used the "CAB CALLOWAY" mark for retail stores or internet websites for sales of compact discs or other items prior to Mrs. Langsam's May 2001 deposition.  (*Id.*)

[18] Although Defendant argues that the applicant's "ongoing and existing" business must provide the goods or services listed in its ITU application, (*see* D's Reply 9), the law is not clear on this point, *compare Railrunner N.A., Inc. v. N.M. Dep't of Transp.*, Opp. No. 91172851, 2008 TTAB LEXIS 58, at *6-7 (T.T.A.B. July 17, 2008) (non-precedential) ("In other words, prior to the filing of an allegation of use . . . an intent-to-use . . . applicant may not transfer its application to another, unless it transfers with it at least that part of [the] applicant's business to which the mark pertains.  And as the last clause of the quoted subsection emphasizes, even that transfer is only permissible if the applicant actually has such a business, *i.e.*, if the applicant is already providing the goods or services recited in the application."), *with Exel Oyj v. D'Ascoli*, Opp. No. 91160397, 2008 WL 4354180, at *7 (T.T.A.B. Sept. 19, 2008) (non-precedential) ("The statute must allow for the transfer of a Section 1(b) application claiming a bona fide intention to use the mark for goods which are not yet in production or which may be in the planning stage, and which may represent an extension of an applicant's business.  The statute does not require that the mark ultimately must be used on each of the goods identified in the application that has been transferred lest the assignment, ex post facto, be rendered invalid.").  While I thus do not regard Mrs. Calloway's failure to use the mark on any of the items listed in the ITU application as dispositive, it is relevant to the question of whether she was in fact operating an "ongoing and existing" business to which the mark "CAB CALLOWAY" pertained.

16

As Cab Calloway's sole legatee, Mrs. Calloway inherited all of his "property . . . , real, personal and mixed" upon his death, including "all royalties and residuals or other payments or rights to payment." (Langsam Decl. Ex. 2, at 1.) Mrs. Langsam's deposition testimony establishes that Mrs. Calloway's activities related to the mark "CAB CALLOWAY" were limited to rights she acquired through his will – receiving royalties and approving the use of Cab Calloway's name or image in exchange for payment – and were not organized as a business during the relevant time period.

Mrs. Langsam does not identify any actions taken by Mrs. Calloway that differed from what Cab Calloway did during his lifetime – activities that this Court, for reasons I find persuasive, has previously held do not comprise a business.[19] Mrs. Calloway's collection of royalties due Cab Calloway's estate for prior performances does not rise to the level of operating an "ongoing and existing" business. *Accord Calloway I*, slip op. 9 (collecting royalties fails to allege use of service mark). Likewise, approving the use of Cab Calloway's name or image in exchange for payment – particularly without taking any steps to "market, merchandise, advertise, promote and sell the products bearing Cab Calloway's name, likeness, voice, or caricature," or developing a public expectation related to the Cab Calloway-brand – does not rise to the level of operating a business to which the mark "CAB CALLOWAY" pertains. Unlike *Fitzpatrick*, where the court upheld the assignment of an ITU application by a "well known" manager in the music industry to his new record label, Plaintiff admits that Mrs. Calloway has not taken any steps to identify herself with the mark "CAB CALLOWAY" beyond being Cab Calloway's widow. *See Fitzpatrick*, 2010 WL 3377500, at *3 (finding that, although assignor only had intellectual property rights in mark at issue at time of assignment, assignor was "well known in

---

[19] *Calloway I* and *Calloway II* previously established that Cab Calloway was not operating a business at his death that passed to Mrs. Calloway in his will. *Calloway II*, 48 F. App'x at 18; *Calloway I*, slip op. 9.

the music industry" and originated mark "as part of a distinctive trade style" and thus had transferred his goodwill in mark to assignee).

Regarding Plaintiff's alleged business activities, Mrs. Langsam stated that Plaintiff had no assets upon its formation in December 2000, and, in May 2001 following the assignment of the ITU application, Plaintiff had no income,[20] conducted its operations from Mrs. Langsam's home, and was "still attempting to start [its] business." (Langsam Dep. 8:9-14, 26:9-12, 27:18-20, 102:24-25.) When asked to describe Plaintiff's business, Mrs. Langsam responded, "There hasn't been much business of Creative Arts. We have been . . . trying to find out where the recording contracts are, which recording contracts there are, which record companies there are," but clarified that Plaintiff's "intended business" was "to make sure that Cab Calloway is protected, his legacy is protected, and that we exploit all opportunities to bring Cab Calloway to the public." (*Id.* at 17:3-23.) When asked to identify Plaintiff's business activities since its formation, Mrs. Langsam identified retaining an accountant to review Cab Calloway's various contracts and advising third parties of the Cab Calloway-related rights held by Plaintiff related to recording and publishing contracts. (*Id.* at 21:17-22:22.)

---

[20] Plaintiff objects to this assertion as "incorrect," but does not provide any further details as to why aside from writing, "See Cabella's dc. EMI Music Publishing, Gear, Sony Audit, both." (P's 56.1 ¶ 30.) Plaintiff appears to be referring to a Music Publishing Agreement with EMI Music Publishing ("EMI") assigned to Mrs. Calloway in September 2000 that allegedly paid royalties on a biannual basis to Mrs. Calloway and Plaintiff; an audit of Sony Music that allegedly resulted in a payment to Mrs. Calloway in summer 2000; and a license to Gear, Inc. assigned to Mrs. Calloway in summer 2000 that allegedly paid royalties to Mrs. Calloway and Plaintiff. (Langsam Decl. ¶¶ 21, 23, 34.) All of these events predated Mrs. Langsam's May 2001 deposition testimony that Plaintiff had no income. Mrs. Langsam further stated at her deposition that Plaintiff had not yet received any royalties from these activities, although they were due to Plaintiff at some point in the future. (*See* Langsam Dep. 27:18-29:15.) Plaintiff may not create an issue of material fact by submitting a declaration contradicting earlier deposition testimony, *see Bickerstaff*, 196 F.3d at 455; *Ramos*, 2011 WL 2565330, at *4, and conflicting testimony about Plaintiff receiving income before May 2001 from the EMI agreement or the Gear license will be disregarded. The payment resulting from the audit of Sony Music was allegedly made to Mrs. Calloway, not Plaintiff, and is not contradicted by Mrs. Langsam's deposition testimony. In any event, even if Plaintiff had income as of May 2001, it would not change the outcome of this Motion.

Although not essential, "courts historically have looked for a transfer of the assets

embraced by the trademark to evidence the passage of good will." *Fitzpatrick*, 2010 WL

3377500, at *3. Here, even though Mrs. Calloway assigned Plaintiff all of her Cab Calloway-

related rights acquired from his will and from the 2000 settlement agreement with Messrs.

Rainey and Albert, (*see* Langsam Decl. Ex. 5), Mrs. Langsam admitted that following the

assignment of the ITU application, Plaintiff was "still attempting to start [its] business,"

(Langsam Dep. 102:24-25). Thus, even if Mrs. Calloway had an "ongoing and existing"

business, which she did not, Plaintiff could hardly have been a "successor" to it. 15 U.S.C. §

1060(a)(1).

Similarly, while assignments of ITU applications have been upheld as satisfying the anti-

trafficking provision of the Lanham Act where the assignee is producing a product or offering a

service substantially similar to that of the assignor or where there is a continuity of management,

*see Fitzpatrick*, 2010 WL 3377500, at *3 & n.42, neither situation is present here. Not only did

Plaintiff's management include three additional members beyond Mrs. Calloway – Mrs.

Langsam, Mrs. Langsam's husband, and Chris Calloway – but Plaintiff describes its nascent

business as largely involving cataloguing and enforcing its Cab Calloway-related rights, which is

neither the offering of a product or service nor even the same activities (receiving royalties and

licensing his name or image) in which Mrs. Calloway was engaged before the assignment.

(Langsam Dep. 18:9-17, 21:17-22:22.)

Because I find that the Defendant has satisfied his initial burden of demonstrating the

absence of a genuine issue of material fact relating to whether Mrs. Calloway had an "ongoing

and existing" business related to the mark "CAB CALLOWAY" between July 23, 1999 and

January 22, 2001, I turn to the undisputed activities in which Mrs. Calloway engaged during the

19

relevant time period that Plaintiff alleges constitute an "ongoing and existing" business related to the mark.

        1.    <u>Cab Calloway School of the Arts</u>

Plaintiff alleges that Mrs. Calloway's involvement with the Cab Calloway School of the Arts constitutes an ongoing business activity related to the mark "CAB CALLOWAY." (*See* P's Mem. 4-5, 11.) According to Plaintiff, Cab Calloway initially granted the Red Clay School District permission to use his name for the School of the Arts prior to his death, and the school is authorized to sell various clothing items, school supplies, and other products bearing the "CAB CALLOWAY" mark pursuant to an original license from Cab Calloway that was relicensed by Mrs. Calloway and Plaintiff. (*See id.* at 4-5.)

Any relicensing by Mrs. Calloway to the Cab Calloway School of the Arts does not rise to operating an "ongoing and existing" business to which the mark "CAB CALLOWAY" pertains. First, Plaintiff's pleadings contain no specifics regarding precisely when Mrs. Calloway relicensed the mark nor does Plaintiff attach any documents pertaining to this relicensing that indicate that any relicensing by Mrs. Calloway occurred post-July 23, 1999, the date of the stipulation from the underlying TTAB proceeding. (*See id.* at 5 ("Cab Calloway School of the Arts currently sells clothing items and has done so since as early as 1994 pursuant to a license from Cab Calloway, which was subsequently relicensed by Zulme Calloway and by Creative Arts.").) The only evidence Plaintiff submits to support its assertion that Mrs. Calloway engaged in business activities by relicensing the mark to the school is an undated Cab Calloway School of the Arts "CCSA Custom Cabby Wear Order Form" and photos of a selection of the available gear, which is irrelevant to the question of whether Mrs. Calloway relicensed the use of

the previously-licensed mark "CAB CALLOWAY" to the school post-July 23, 1999. (Langsam Decl. Ex. 1.)

Second, assuming that the relicensing occurred after Mrs. Calloway filed her ITU application in July 1999, relicensing the use of Cab Calloway's name, as discussed earlier, does not constitute an "ongoing and existing" business. Indeed, it seems clear that it is personnel at the school who run the small business of selling clothing and school supplies with the school's logo. Martin Luther King Jr. High School in Manhattan probably sells items with its logo, but that would hardly constitute a business of Dr. King's heirs, and Cab Calloway's heirs giving permission for others to run the business does not itself constitute a business.

### 2. Cab Calloway Foundation

Mrs. Calloway and other family members founded the Cab Calloway Foundation in 1995 to honor Cab Calloway's legacy. (P's Mem. 5.) Plaintiff makes no specific allegations concerning Mrs. Calloway's association with or activities promoting the Foundation post-July 23, 1999, and nothing in the record indicates that Mrs. Calloway had involvement with the Cab Calloway Foundation between July 1999 and January 2001 that constituted an "ongoing and existing" business to which the mark "CAB CALLOWAY" pertains.

### 3. Broadway Musical

Plaintiff alleges that Mrs. Calloway and Mrs. Langsam began contemplating a Broadway musical based on Cab Calloway's music and life story in 1996 and retained an attorney, Allen H. Arrow, who commenced negotiations for such a production in 1999. (*Id.* 6, 8-9; Arrow Decl. ¶4.)[21] Following its formation, Plaintiff continued to engage Mr. Arrow's services regarding the musical, and a tentative written agreement was reached in July 2001 before negotiations

---

[21] "Arrow Decl." refers to Declaration of Allen H. Arrow, Esq. in Opposition to Defendant's Motion for Summary Judgment. (Doc. 63.)

ultimately ceased when the parties were unable to reach a binding agreement. (P's Mem. 9-10; Arrow Decl. ¶¶ 5-6.)

Neither Plaintiff nor Mr. Arrow make any specific allegations regarding precisely when in 1999 Mr. Arrow was retained, and Mr. Arrow's declaration indicates that Mrs. Langsam retained his services, not Mrs. Calloway. (Arrow Decl. ¶ 4.) The relevant inquiry here is only whether Mrs. Calloway's actions between July 23, 1999 and January 22, 2001 constituted an "ongoing and existing" business relating to the mark "CAB CALLOWAY," and Plaintiff has failed to allege any involvement by Mrs. Calloway with the musical negotiations that would rise to the level of use of a mark. Further, Plaintiff acknowledges that the negotiations related to a potential musical resulted only in a tentative agreement in July 2001 – following the assignment of the ITU application from Mrs. Calloway to Plaintiff. Plaintiff has failed to allege that Mrs. Calloway had any involvement at all, either directly or as the client directing Mr. Arrow, in the musical negotiations during the relevant period. Further, assuming Mr. Arrow represented the entire Calloway family including Mrs. Calloway, (see id.), and conducted negotiations between July 23, 1999 and January 21, 2001, there is no indication in the record that the musical negotiations constituted a use of the mark "CAB CALLOWAY" or that the Calloway family was organized as a business while Mr. Arrow represented its interests.[22]

4. Royalties and Licensing

Plaintiff alleges that Mrs. Calloway received royalties from a Music Publishing Agreement with EMI as well as from a trademark license to Gear, Inc. – both assigned to Mrs.

---

[22] Mrs. Langsam stated at her 2001 deposition that there were no other "deals pending [for Plaintiff] for the licensing of the name, likeness, or voice of Cab Calloway" aside from "some talks between us and some other people regarding . . . a musical of some kind." (Langsam Dep. 26:20-27:11.) Plaintiff objects to this testimony as "incorrect," but again provides no specifics regarding the veracity of the statement other than "See Cabella's dc." (P's 56.1 ¶ 29.) Plaintiff's objection will be disregarded as Plaintiff has failed to specify how Mrs. Langsam's statement was inaccurate.

Calloway in 2000 as a result of a settlement of a lawsuit with Messrs. Rainey and Albert and

their respective corporate entities. (P's Mem. 7-8, 10.) At Mrs. Langsam's 2001 deposition, she

stated that from Labor Day 2000 until May 19, 2001, neither Mrs. Calloway nor Plaintiff had

received royalties from these rights acquired through the settlement of the lawsuit because they

would not be due "for another six to eight to twelve months or a year from now" but that

Plaintiff would receive the royalties when they were paid. (Langsam Dep. 27:18-29:3.) As

Plaintiff cannot create an issue of material fact through a declaration that conflicts with earlier

deposition testimony, *see Bickerstaff*, 196 F.3d at 455; *Ramos*, 2011 WL 2565330, at *4,

Plaintiff's assertions that Mrs. Calloway received royalties following the settlement and prior to

the assignment of the ITU application will be disregarded. Even if I were to consider this

assertion, the receipt of income from these royalties – as with the other royalty income due to

Mrs. Calloway discussed earlier – does not give rise to any "ongoing and existing" business

pertaining to the mark "CAB CALLOWAY."

      Plaintiff further alleges that Mrs. Calloway also granted licenses to AT&T in October

1998 to use a Cab Calloway composition in a commercial; to documentary filmmakers in

November 1999 for the use of Cab Calloway's image, music, and film clips; and to Chris

Calloway in late 2000 for use of Cab Calloway's musical compositions and likeness for her 2001

tour. (P's Mem. 8-10.) Plaintiff also alleges that Mrs. Calloway licensed a musical composition

to Warner Special Products in early January 2001, an agreement that was formalized by Plaintiff

following its creation on January 22, 2001. (*Id.* at 10; Langsam Decl. Ex. 6.) Although all of

these examples occur within the stipulated date range – save the license to AT&T, which will be

disregarded – licensing the use of Cab Calloway's compositions or image, as discussed earlier,

does not rise to the level of operating an "ongoing and existing" business. It is simply personal stewardship or management of assets.

     5.    <u>Professionals</u>

Plaintiff alleges that Mrs. Calloway retained various professionals to assist her in managing the "CAB CALLOWAY" mark: attorneys from Karlin & Karlin to litigate the case against Messrs. Rainey and Albert beginning in 1996 and ending in summer 2000; accountant Hal Webman in 1999 to review and audit Cab Calloway's contracts and financial reports from Sony Music; and attorney James Kendrick in 1998 to manage Cab Calloway's copyrights. (P's Mem. 6-8.) Plaintiff allegedly continued a relationship with all of these professionals following its formation. (*Id.* at 10.) Plaintiff makes no allegations that Mr. Webman's retention occurred post-July 23, 1999, but presumably it continued through the relevant period as Mrs. Calloway allegedly received a payment from Sony in 2000 as a result of the audit. (*Id.* at 8.) As Plaintiff does not allege whether Mr. Kendrick's retention continued through the relevant time period, however, this allegation will be disregarded.[23]

Karlin & Karlin's representation related to the discrete issue of whether Cab Calloway had intentionally encumbered some of his intellectual property rights. (*Id.* at 6.) The legal actions taken against Messrs. Rainey and Albert sought to clarify precisely what rights to Cab Calloway's intellectual property Mrs. Calloway had inherited following Cab Calloway's death, and the retention of attorneys to resolve this issue does not suggest that Mrs. Calloway was operating an "ongoing and existing" business related to the mark "CAB CALLOWAY." The same holds true for Mr. Webman's actions with respect to Sony Music, which also clearly related to the management of the rights that Mrs. Calloway had inherited from her late husband.

---

[23] Were I to consider the retention of Mr. Kendrick, my analysis would be the same as it is with respect to the other two professionals.

24

\*          \*          \*

No reasonable jury could find that Mrs. Calloway's activities in the relevant time period – as alleged by Plaintiff and taken together – amount to Mrs. Calloway's operation of any "ongoing and existing" business between July 23, 1999 and January 22, 2001.  The record is likewise devoid of evidence creating a genuine issue of material fact as to whether Mrs. Calloway's affairs, even if they somehow could be construed as a going concern, acquired any goodwill to which the mark "CAB CALLOWAY" pertained.  Accordingly, pursuant to 15 U.S.C.§ 1060(a)(1), Mrs. Calloway's assignment of her ITU application to Plaintiff is void.

## IV.    Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending Motion, (Doc. 54), enter judgment in favor of Defendant, and close the case.

**SO ORDERED.**

Dated: December 27, 2012
White Plains, New York

_Cathy Seibel_
CATHY SEIBEL, U.S.D.J.